No. 14-2202

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

_____

**LEE PELE**,
*Plaintiff - Appellant*,

v.

**PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY** d/b/a American Education Services,
*Defendant - Appellee*.

_____

On appeal from the U.S. District Court for the Eastern District of Virginia
(Hon. James C. Cacheris, U.S. District Judge)

_____

## APPELLANT'S REPLY BRIEF

| | |
|---|---|
| A. Hugo Blankingship, III | Scott Michelman |
| Thomas B. Christiano | Allison M. Zieve |
| BLANKINGSHIP & CHRISTIANO, P.C. | PUBLIC CITIZEN LITIGATION GROUP |
| 11790 Sunrise Valley Drive, Suite 103 | 1600 20th Street NW |
| Reston, VA 20191 | Washington, DC 20009 |
| (571) 313-0412 | (202) 588-1000 |

*Counsel for Plaintiff-Appellant Lee Pele*

February 24, 2015

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT .............................................................................................................2

    I. PHEAA'S ARGUMENTS ON THE STATE-LIABILITY AND AUTONOMY FACTORS CONFLICT WITH THIS COURT'S DECISION IN *OBERG* ...............................................................................2

        A. PHEAA's Analysis Of The Facts Regarding State Liability Contravenes *Oberg* ..........................................................................2

        B. PHEAA's Analysis Of The Facts Regarding Autonomy Contravenes *Oberg* ........................................................................10

    II. THE FACTS REVEALED IN DISCOVERY REGARDING THE FOCUS OF PHEAA'S ACTIVITIES AND ITS INVOCATION OF DIVERSITY JURISDICTION CONFIRM THAT PHEAA IS NOT AN ARM OF THE STATE ....................................11

        A. The Court Should Not Disregard PHEAA's Primary Activities ...........................................................................................11

        B. PHEAA's Assertions Of Diversity Jurisdiction Further Weigh Against Sovereign Immunity ..................................................14

CONCLUSION ........................................................................................................16

CERTIFICATIONS .................................................................................................17

# TABLE OF AUTHORITIES

## CASES

*Christy v. Pennsylvania Turnpike Commission*,
    54 F.3d 1140 (3d Cir. 1995) ..........................................................................8

*Hess v. Port Authority Trans-Hudson Corp.*,
    513 U.S. 30 (1994)..........................................................................................8

*Hutto v. South Carolina Retirement System*,
    773 F.3d 536 (4th Cir. 2014) ..........................................................................8

*Regents of the University of California v. Doe*,
    519 U.S. 425 (1997).......................................................................................9

*Ristow v. South Carolina Ports Authority*,
    58 F.3d 1051 (4th Cir. 1995) .....................................................................4, 5

*South Carolina Department of Disabilities & Special Needs v. Hoover
    Universal, Inc.*,
    535 F.3d 300 (4th Cir. 2008) ..........................................................4, 8, 14, 15

*United States ex rel. Oberg v. Pennsylvania Higher Education Assistance
    Agency*,
    745 F.3d 131 (4th Cir. 2014) ...............................................................*passim*

## STATUTES

24 Pa. Stat. § 5104(3)..................................................................................5, 6, 7, 8, 9

24 Pa. Stat. § 5104(8)............................................................................................5, 8, 9

## INTRODUCTION AND SUMMARY OF ARGUMENT

PHEAA's defense of the district court's decision adds little to what the district court had to say. PHEAA leans hard on the facts highlighted in the decision below and attempts, as the district court did, to imbue them with meanings in conflict with this Court's analysis in *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131 (4th Cir. 2014). PHEAA's arguments cannot prevail unless this Court ignores its own prior decision.

PHEAA attacks Pele for his reliance on *Oberg* and supposed failure to rebut the facts in the record. But the parties essentially agree on the facts. Where they part ways is on the significance of those facts. As to that disagreement, *Oberg* — which already analyzed most of the facts at issue here — should be the primary guide. That *Oberg*'s rulings of law came in the context of a motion to dismiss does not make this Court's rulings there any less binding or relevant, because the facts shown in discovery largely confirm the factual assumptions the Court made in *Oberg*. What PHEAA derides as Pele's "fixation" on *Oberg* is simply reliance on the most relevant precedent.

As to the one area in which the facts have turned out to be significantly different than what was assumed in *Oberg* — the question of PHEAA's out-of-state focus — PHEAA replicates the district court's error of focusing on the entity's mission to the exclusion of its primary activities. Warning that Pele is

1

trying to "punish" PHEAA for its success in servicing loans outside of Pennsylvania, PHEAA insists that its out-of-state activities are either irrelevant or must be viewed only as enhancing PHEAA's ability to help students. But this Court saw it differently in *Oberg*, which considered not only PHEAA's mission but also where its activities are primarily focused. Here, as there, it is appropriate to consider whether PHEAA's activities are focused within the state or outside of it in determining whether the entity is an arm of the state.

The decision below should be reversed.

## ARGUMENT

### I. PHEAA'S ARGUMENTS ON THE STATE-LIABILITY AND AUTONOMY FACTORS CONFLICT WITH THIS COURT'S DECISION IN *OBERG*.

PHEAA errs in interpreting the facts in a legal vacuum. This Court already determined in *Oberg* the legal significance of many of the facts adduced in discovery here. The Court should reject PHEAA's attempt to reinterpret the facts in a manner inconsistent with the Court's precedent.

#### A. PHEAA's Analysis Of The Facts Regarding State Liability Contravenes *Oberg*.

The parties do not disagree, for the most part, about the facts. For instance, PHEAA admits that it has been financially independent since 1988 and that its funds remain earmarked even within the Pennsylvania Treasury. Br. of Appellee

2

("PHEAA Br.") 10, 13. Where PHEAA's analysis runs aground is in proceeding from these facts to conclusions that contradict *Oberg*.

*First*, PHEAA mounts a general attack on the relevance of *Oberg*. *See, e.g.*, PHEAA Br. 22, 26-27, 32-36. According to PHEAA, the district court was not bound by *Oberg* when considering a motion for summary judgment because *Oberg* was decided on a motion to dismiss and remanded for further factfinding. *See* PHEAA Br. 22, 26-27, 33-34, 38. This suggestion is meritless. In reviewing a decision on the motion to dismiss, the *Oberg* court assumed certain facts to be true, as is the standard practice on motions to dismiss. When it reversed the dismissal of the case, *Oberg* remanded for discovery — also standard practice. Now that the facts are in, they mainly confirm the assumptions underlying *Oberg*'s conclusions of law, as Pele documents. *See* Appellant's Opening Br. ("Pele Br.") 5-6, 17-18, 23. Therefore, *Oberg* remains directly on-point authority regarding the application of the law to the facts present here.

*Second*, PHEAA attempts to minimize its financial independence by suggesting that this condition is transitory and might change at any time. PHEAA Br. 22, 36-37, 44. But that is not how this Court understood that fact in *Oberg*, where PHEAA's quarter-century of financial independence helped show why Pennsylvania would not be functionally liable for a judgment against PHEAA. *Oberg*, 745 F.3d at 138-39. PHEAA's argument that an entity's status as an arm of

3

the state (or not) should be fixed and not change when the agency's economic relationship with the state changes, PHEAA Br. 37-38, is inconsistent with this Court's precedent — not only *Oberg*, but the whole line of arm-of-the-state cases using the same multi-factor, fact-based inquiry. *See S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*, 535 F.3d 300, 303 (4th Cir. 2008) (tracing test back through decades of Supreme Court and Circuit precedent). Most of the factors this Court examines *are* subject to change, including the functional vulnerability of the state treasury, the question of autonomy (which depends in part on variable circumstances such as the agency's use of counsel and the composition of its board), and the nature of the entity's activities. In fact, the composition of PHEAA's board and the nature of its activities have evolved meaningfully over the past several years alone. *See* Pele Br. 6-8, 23 n.3, 25-26. Both under *Oberg* specifically and under this Court's arm-of-the-state jurisprudence generally, PHEAA is incorrect that its financial independence should be disregarded because it is not guaranteed to remain constant for all time.

PHEAA's reliance on *Ristow v. South Carolina Ports Authority*, 58 F.3d 1051 (4th Cir. 1995), to support the proposition that Pennsylvania would be functionally liable if Pele prevails in his lawsuit is likewise misplaced. In *Ristow*, the Court found that the Ports Authority was "not legislatively structured to retain unlimited profits or surplus" and was "not self-sufficient." *Id.* at 1054. Although

4

"in the strictest sense there is no legal obligation by the State of South Carolina to cover the Ports Authority's debts," the Court noted, the state "provides whatever economic support is necessary over and above the Ports Authority's net revenues to insure its continued vitality" and "takes back any portion of the Authority's net revenues" it deems appropriate. *Id.* Those facts stand in stark contrast to those present here: Pennsylvania does not provide additional economic support to "insure [PHEAA's] continued vitality" and has not done so in more than twenty-five years; the state does not "take[] back any portion of [PHEAA's] net revenues"; and PHEAA *is* "self-sufficient." *Oberg*, 745 F.3d at 138-39. The contrast between the Ports Authority and PHEAA underscores that Pennsylvania would not be functionally liable for PHEAA's debts.

*Third*, PHEAA seeks to avoid two separate provisions of Pennsylvania law stating that Pennsylvania is not liable for PHEAA's debts, 24 Pa. Stat. §§ 5104(3) & (8), by arguing that these statutory provisions apply to a subset of PHEAA's activities not including adverse judgments. PHEAA Br. 27-28. This reading is contradicted by the expansive plain language of the statutory provisions themselves: "*no* obligation of the agency shall be a debt of the State." 24 Pa. Stat. § 5104(3) (emphasis added); *accord id.* § 5104(8) ("*no* obligation of the agency shall be a debt of the Commonwealth" (emphasis added)). Applying this same language in *Oberg* in answering the same question here — whether Pennsylvania would be

5

legally liable for a judgment against PHEAA — this Court correctly understood that "Pennsylvania explicitly disavows liability for *all* of PHEAA's debts." 745 F.3d at 138 (citing 24 Pa. Stat. § 5104(3); emphasis in original).

*Fourth*, PHEAA argues that any judgment against it would be paid by the state because PHEAA's funds are commingled with those in the state treasury. PHEAA Br. 33-35. However, this Court has properly rejected the argument that the location of PHEAA's money is dispositive of the question whether the state would be liable for PHEAA's debts. *Oberg*, 745 F.3d at 138 (noting that "state statutes require that [PHEAA's] funds be deposited into the state treasury and that no money be paid from the treasury without approval from the state treasurer" but going on to hold that the liability factor nonetheless weighs "heavily" against sovereign immunity (citations and internal quotation marks omitted)). Instead of focusing on commingling, *Oberg* relied on the distinction between PHEAA's own money and the general state funds — a distinction that is, as *Oberg* also noted, required by the state law authorizing PHEAA. *Id.* (quoting 24 Pa. Stat. § 5104(3)).[1]

PHEAA goes so far as to argue that it does not have *any* money of its own. *See* PHEAA Br. 35 ("[T]he notion of PHEAA's 'own moneys' is a fiction"). That

---

[1] PHEAA reliance on general state-law provisions about the operation of the state treasury over specific provisions governing PHEAA, PHEAA Br. 27, contravenes the basic statutory canon that the specific governs the general — a canon this Court applied in weighing the relevant facts about PHEAA. *Oberg*, 745 F.3d at 138.

6

startling claim is refuted both by state law and the factual record. In describing PHEAA's powers and duties, Pennsylvania law repeatedly refers to PHEAA's own money, even in provisions recognizing that the money will be held in the state treasury. *See, e.g.*, 24 Pa. Stat. § 5104(3) (providing that PHEAA "shall have no power to pledge the credit or taxing power of the State nor to make its debts payable out of any moneys except *those of the corporation*" (emphasis added)); *id.* (providing that PHEAA's earnings "shall be available to the agency and shall be deposited in the State Treasury and may be utilized at the discretion of the board of directors for carrying out any of the corporate purposes of the agency"). Moreover, PHEAA's Chief Financial Officer testified in deposition that the "net worth" *of PHEAA* was $951.6 million in 2013, JA 362, and that PHEAA operates independently of the need for state funding, JA 405-10. Those statements would be nonsensical if PHEAA did not have its own money, because the reserves would be indistinguishable from the rest of the state's money and PHEAA would have no "net worth" of its own. PHEAA's suggestion that Pele is engaging in formalism by relying on the earmarking of PHEAA funds on paper, PHEAA Br. 34, has it backwards. It is PHEAA that seeks refuge in formalism by focusing (in contravention of *Oberg*) on where the money is held, rather than on the fact that it is identifiable as, accountable as, treated as, and statutorily designated as PHEAA's money. *See Oberg*, 745 F.3d at 138-39. In asking the Court to reduce the arm-of-

the-state inquiry to a matter of labels on bank accounts, PHEAA runs up against both *Oberg* and this Court's previous admonition that the relevant inquiry "does not focus on whether funds are retained in a particular account of the State or in the general fund of the State treasury." *Hoover*, 535 F.3d at 305.

*Finally*, PHEAA argues that the speculation of PHEAA Board Chair William Adolph about appropriations that Pennsylvania might make if PHEAA were held liable establishes that Pennsylvania would be liable for PHEAA's debts. PHEAA Br. 30-31, 36. That contention runs headlong into the Supreme Court's decision in *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30 (1994), which framed the crucial inquiry as follows: "If the expenditures of the enterprise exceed receipts, is the State in fact *obligated* to bear and pay the resulting indebtedness of the enterprise? When the answer is 'No' — both legally and practically — then the Eleventh Amendment's core concern is not implicated." *Id.* at 51 (emphasis added); *accord Hutto v. S.C. Retirement Sys.*, 773 F.3d 536, 546 (4th Cir. 2014) (focusing on this inquiry). Regarding PHEAA, the answer to that key question is no. *Oberg*, 745 F.3d at 138; 24 Pa. Stat. §§ 5104(3) & (8). Pennsylvania's hypothetical future choice about whether to appropriate money voluntarily to supplement PHEAA's nearly $1 billion reserve, *see* JA 362, is irrelevant. *See Christy v. Pa. Tpk. Comm'n*, 54 F.3d 1140, 1147 (3d Cir. 1995).

8

Relatedly, PHEAA takes exception to Pele's characterization of Adolph's testimony about future state appropriations as speculative, and PHEAA claims that Pele has produced no evidence to contradict Adolph. *See* PHEAA Br. 31 n.10. Of course, guesses about possible future events are inherently speculative. In any event, Pele has in fact cited evidence that contradicts Adolph: the experience of PHEAA's own Chief Financial Officer Timothy Guenther. *See* Pele Br. 5, 20-21. Although PHEAA has paid several million-dollar settlements in recent years, JA 349, 379-80, Guenther testified that, in his twenty years with PHEAA, he is not aware of any appropriations from state coffers to cover the cost of settlement payments; rather, such payments have been made from PHEAA's own discretionary funds. JA 356-57, 385, 421. Adolph's speculation is not enough to overcome state law that plainly does not obligate Pennsylvania to cover PHEAA's debts and Gunther's testimony that Pennsylvania historically has not done so.[2]

---

[2] PHEAA fares no better in arguing that the Court should credit Chairman Adolph's hypothesis because of the need to focus on "*potential* legal liability." PHEAA Br. 36 (quoting *Regents of the University of California v. Doe*, 519 U.S. 425, 431 (1997); emphasis added by PHEAA). In emphasizing the word "potential," PHEAA overlooks the next word in the phrase it quotes: "legal." Here, there is no potential for Pennsylvania to be *legally* liable for PHEAA's debts, as state law makes clear. *See Oberg*, 745 F.3d at 138; 24 Pa. Stat. §§ 5104(3) & (8).

9

## B. PHEAA's Analysis Of The Facts Regarding Autonomy Contravenes *Oberg*.

The same facts on which PHEAA principally relies to argue against autonomy here were considered in *Oberg*, where the Court concluded that the autonomy factor weighed *against* finding PHEAA to be an arm of the state. In the Court's analysis, PHEAA's financial independence was the "most critical[]" consideration, and the Court concluded that this fact, along with other indicia of autonomy, outweighed the facts upon which PHEAA relied — including state officials' "veto power over PHEAA's operations" and the composition of PHEAA's board. *Oberg*, 745 F.3d at 139; *cf.* PHEAA Br. 38-45 (focusing on these same facts again). Even the district court, in ruling in favor of sovereign immunity here, found that the autonomy factor favored Pele. JA 865-69. Weighing the same facts this Court considered in *Oberg* should yield the same conclusion as in *Oberg*.

Trying to avoid the fact that the Court considered "most critical[]" to PHEAA's autonomy, PHEAA disavows its financial independence, arguing that it is independent only with respect to its *operational* finances. PHEAA Br. 43. But the fact that PHEAA does not rely on any state appropriation (and has not for more than twenty-five years) to fund its operations *means* that it is financially independent. PHEAA does not explain how the Court could draw any other conclusion from the fact that PHEAA is independent with regard to operational funding. Indeed, this Court has viewed operational independence as financial

10

independence. *See Oberg*, 745 F.3d at 139 ("PHEAA is financially independent. According to its annual reports, which were attached to the amended complaint, PHEAA receives no operational funding from Pennsylvania."). PHEAA also claims that its financial independence is diminished by "Commonwealth control over all expenditures and debt." PHEAA Br. 43. This contention does not explain the theory that financial independence is distinct from independence as to operational funding, but rather changes the subject by reprising the contention — rejected in *Oberg* — that state officials' involvement in PHEAA's spending decisions negates PHEAA's autonomy. *See Oberg*, 745 F.3d at 139. As in *Oberg*, PHEAA is financially independent, and that factor is the "most critical[]" in assessing PHEAA's autonomy. *Id.*

## II. THE FACTS REVEALED IN DISCOVERY REGARDING THE FOCUS OF PHEAA'S ACTIVITIES AND ITS INVOCATION OF DIVERSITY JURISDICTION CONFIRM THAT PHEAA IS NOT AN ARM OF THE STATE.

### A. The Court Should Not Disregard PHEAA's Primary Activities.

PHEAA argues that, in considering the nature of PHEAA's activities, the Court should be guided only by the agency's mission. But when the Court addressed this factor in *Oberg*, it looked also at the primary geographic focus of PHEAA's activities. 745 F.3d at 140. In asking the Court now to disregard PHEAA's $100-plus billion loan servicing business and look only at the $100 million PHEAA spends in contributions to and administration of in-state student

11

aid programs, PHEAA takes too narrow a view of what facts are relevant — a view that (again) conflicts with *Oberg*. As Pele explained in his opening brief, PHEAA's $100-plus billion loan servicing program is focused primarily out of state. Therefore, the nature of PHEAA's activities, which supported sovereign immunity in *Oberg* based on assumed facts about the time period relevant to that case (2002-06), weighs against immunity here based on the discovered facts about the year (2013) of the events giving rise to Pele's claim. *See* Pele Br. 25-28.

PHEAA attempts to bulk up its numbers regarding in-state student expenditures by citing a *three*-year total of expenditures, *see* PHEAA Br. 53 ("[S]ince 2011, PHEAA has budgeted $310 million of the revenues it has generated to supplement Pennsylvania's financial aid and grant programs."), whereas Pele's measure of the size of PHEAA's business — more than $105 billion dollars in loans held, guaranteed or serviced — is for a single year, Pele Br. 26. Not only is the comparison of a three-year aggregate to a one-year number incongruous, but even comparing three years' worth of PHEAA's expenditures on its (in-state) mission to the size of PHEAA's (primarily out-of-state) business in a single year shows that the latter is larger by several orders of magnitude. The Court should not ignore PHEAA's billion-dollar out-of-state business in considering PHEAA's primary activities.

PHEAA charges that to count the size of its out-of-state business as weighing against sovereign immunity would "penalize[]" it "for its success." PHEAA Br. 52. In addition to the fundamental problem that its argument is at odds with the approach this Court took in *Oberg*, PHEAA's argument attacks a straw man. What weighs against sovereign immunity is the *out-of-state focus* of PHEAA's activities, not the success of those activities. If PHEAA did just as much business as it does now but focused its efforts in Pennsylvania rather than out of state, the nature of its activities would counsel for rather than against sovereign immunity. PHEAA's analogy to state universities is inapt, because a university's out-of-state activities such as recruiting and promotion of the school are ancillary to a university's main activities, which involve educating students of the state, enticing out-of-state students to come to the state to be educated, and doing scholarly research in the state. Here, by contrast, a sizable majority of the loans PHEAA guarantees or services involve non-Pennsylvania students attending non-Pennsylvania schools. It is appropriate that the arm-of-the-state inquiry consider the primary focus of the entity's activities, lest a nationwide business with no more than a nominal connection to a state be granted sovereign immunity, and considerations of state dignity and autonomy that inform the arm-of-the-state analysis be coopted for unrelated purposes.

For these reasons and those stated in Pele's opening brief, the nature of PHEAA's activities weighs against finding PHEAA to be an arm of the state.

### B. PHEAA's Assertions Of Diversity Jurisdiction Further Weigh Against Sovereign Immunity.

PHEAA is incorrect that this Court's precedent forecloses Pele's argument that PHEAA's own prior invocations of diversity jurisdiction cut against its assertion that it is an arm of the state. The case on which PHEAA relies, *South Carolina Department of Disabilities & Special Needs v. Hoover Universal*, considered an argument meaningfully distinct from Pele's.

In *Hoover*, the Court found that three South Carolina entities were arms of the state despite the fact that they had earlier invoked diversity jurisdiction in that same litigation. PHEAA Br. 59 (citing *Hoover*, 535 F.3d at 301-02). In the district court, the South Carolina entities had brought product liability claims against Hoover Universal, and the court had dismissed the claims on timeliness grounds. 535 F.3d at 301-02. The South Carolina entities then successfully moved the district court to vacate its decision by arguing (for the first time) that the court lacked subject-matter jurisdiction because the plaintiff entities were arms of the state and therefore not "citizens" of South Carolina for the purpose of diversity jurisdiction. *Id.* at 302.

Hoover appealed, arguing that under this Court's multi-factor test, the South Carolina entities did not qualify as arms of the state. *Id.* Hoover did not argue — as

14

Pele does here — that the prior invocation of diversity jurisdiction carried weight in the arm-of-the-state analysis. Instead, Hoover asserted that the entities should be held to their prior position as a matter of fairness: "As Hoover laments, 'Plaintiffs have presented the federal courts with a procedural morass of their own making, and should not be rewarded at this late stage of the proceedings with a "do over" in state court.'" *Id.* at 302-03. Though sympathetic to this position, the Court held that, because the arm-of-the-state issue went to the Court's jurisdiction, the fairness concern could not preclude consideration of that issue. *See id.* at 303. The Court held that the three state-related entities were arms of the state and so the federal courts lacked jurisdiction over the action. *Id.* at 304-08. The state entities' prior invocation of diversity jurisdiction played no role in the Court's consideration of the arm-of-the-state factors.

Thus, although *Hoover* considered as a threshold matter whether the state-related entities' prior litigation position precluded them from arguing that they were arms of the state, the Court did not consider (and was not apparently presented with) the argument Pele advances here: that a state-related entity's prior invocation of diversity jurisdiction should weigh against sovereign immunity *as a part of the multi-factor arm-of-the-state analysis*. Unlike the appellant in *Hoover*, Pele is not asking for PHEAA to be estopped from changing its position. Instead, Pele argues that PHEAA's prior claims that it is a citizen of a state should be

15

considered as part of the arm-of-the-state analysis itself. Just as courts examine the entity's primary activities (factor 3) and the state's view of the entity (factor 4), courts should consider the entity's prior conduct with respect to its own status, including prior invocations of diversity jurisdiction. Because *Hoover* did not address, much less foreclose, this argument, the Court may consider it here. Tellingly, PHEAA offers no substantive reason that its own prior positions regarding its status should not be taken into account as part of the arm-of-the-state analysis.

## CONCLUSION

For the reasons advanced here and in Pele's opening brief, the district court's grant of summary judgment to PHEAA and denial of summary judgment to Pele on the issue of sovereign immunity should be reversed.

Dated: February 24, 2015               Respectfully submitted,

/s/ Scott Michelman

A. Hugo Blankingship, III            Scott Michelman
Thomas B. Christiano                 Allison M. Zieve
BLANKINGSHIP & CHRISTIANO, P.C.      PUBLIC CITIZEN LITIGATION GROUP
11790 Sunrise Valley Drive, Suite 103  1600 20th Street NW
Reston, VA 20191                     Washington, DC 20009
(571) 313-0412                       (202) 588-1000

*Counsel for Plaintiff-Appellant Lee Pele*

## CERTIFICATION OF COMPLIANCE

This brief complies with the type-volume limitation of 32(a)(7)(B) because this brief contains 3,732 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman 14-point type.

/s/ Scott Michelman

## CERTIFICATION OF SERVICE

I certify that on February 24, 2015, I served this brief by ECF on all registered counsel for appellees.

/s/ Scott Michelman